## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHANIE LYNN OLIN, | : | CIVIL NO.: 1:14-CV-00925 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| COUNTY OF | : | |
| NORTHUMBERLAND, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM**
November 4, 2016

## I.    Introduction.

At the core of her complaint, Plaintiff Stephanie Lynn Olin ("Olin") claims that while she was incarcerated at the Northumberland County Prison ("NCP"), a correctional officer by the name of Holly Olvany ("CO Olvany") entered her cell while she was sleeping, wrapped a blanket around her neck, pulled the blanket tight, and choked her.  Pursuant to the provisions of 42 U.S.C. § 1983, Olin raises an excessive force claim under the Eighth Amendment with municipal and supervisory liability tethered thereto, as well as state law claims of assault and battery and intentional infliction of emotional distress.  In addition, Olin names the following five defendants: (1) CO Olvany, who at all relevant times was employed as a correctional officer at NCP; (2) County of Northumberland ("Northumberland

County" or the "County"); (3) Northumberland County Board of Prison Inspectors ("Prison Board"); (4) Roy Johnson, who at all relevant times was the Warden of NCP ("Warden Johnson"); and (5) Brian Wheary, who at all relevant times was the Commander of NCP ("Commander Wheary").  *Doc. 1* at 2-3.

Shortly after the parties consented to proceed before the undersigned United States Magistrate Judge (*see docs. 13*, *14*), they attempted to resolve this matter through mediation.  Their efforts, however, proved to be unsuccessful.  *See doc. 27.*  Now pending before the Court is the defendants'[1] collective motion (*doc. 28*) for summary judgment.  That motion, which has been fully briefed, is ripe for disposition.  For the reasons that follow, we will grant the defendants' motion in its entirety.

## II.    Background.

Pursuant to the Local Rules for the U.S. District Court for the Middle District of Pennsylvania, a party moving for summary judgment must attach to the motion "a  separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."   M.D. Pa. L.R. 56.1. The non-moving party is required to submit "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement], as to which it is

---

[1] With the exception of CO Olvany, all of the previously mentioned defendants have moved for summary judgment.

contended that there exists a genuine issue to be tried." *Id.* Both statements must reference the record for support, and the moving party's statement will be deemed admitted unless controverted by the non-moving party. *See id.*

Here, although the moving defendants have filed a statement of material facts (*doc. 29*), supported by adequate references to the record, Olin has failed to submit a statement of material facts in response thereto. Moreover, Olin expressly states in her brief in opposition (*doc. 33*) to the defendants' motion for summary judgment that she "does not quarrel with the facts asserted" by the defendants. *Id.* at 1. Thus, we adopt the defendants' statement of material facts as undisputed. Those undisputed material[2] facts, which consist of allegations in the complaint, portions of both Olin and the defendants' deposition testimony, and various policies and procedures of NCP, are as follows:

### A.    Allegations in the Complaint.

Olin alleges that on May 20, 2013, she was sentenced to incarceration at NCP for a term of 9 to 23 months. *Doc. 29* at ¶ 2 (citing *doc. 1* at ¶ 10). She alleges that "[d]uring the week of 26-30, 2013,"[3] while she was serving that

---

[2] Although the undisputed statement of material facts (*doc. 29*) includes more facts than what we have set forth here, we find those additional facts to be immaterial to the disposition of the present motion for summary judgment.

[3] At the time Olin filed her complaint, she was unable to identify the month in which the alleged choking occurred. As set forth herein, however, she identifies the month of August at her deposition.

sentence, CO Olvany entered her cell while she was sleeping, wrapped a blanket around her neck, pulled the blanket tight, and began to choke her. *Doc. 29* at ¶¶ 3-4 (quoting *doc. 1* at ¶ 11).

### B.    Olin's Testimony.[4]

Olin testified that in 2013, she was assaulted by CO Olvany at some point during the week of August 26th through the 30th (*doc. 29* at ¶ 12) and that Warden Johnson was the first employee of NCP that she notified (*id.* at ¶ 13).  Specifically, she testified that while Warden Johnson was doing "his "daily walk through" (*doc. 29-2* at 5 (dep. 13)), which was about "[t]hree, maybe four days" after the choking incident (*id.* at 6 (dep. 18)), she told him through the cell door that she had been "harassed" and "assaulted by a guard"  (*id.* at 5 (dep. 14)).

### C.    Commander Wheary's Testimony.[5]

At the time of Olin's incarceration in August and September of 2013, Wheary was the Operations Commander at NCP.  *See doc. 29* at ¶ 19; *doc. 29-3* at 3 (dep. 8).  A portion of his job responsibilities included overseeing the day-to-day

---

[4] Olin's deposition, which was conducted on July 23, 2015, is attached (in condensed form) as an exhibit in support of the defendants' motion for summary judgment. *See doc. 29-2.*

[5] Commander Wheary's deposition, which was conducted on July 23, 2015, is attached (in condensed form) as an exhibit in support of the defendants' motion for summary judgment. *Doc. 29-3.*

needs of prisoners and, to an extent, the training of personnel.  *Doc. 29* at ¶ 20; *doc. 29-3* at 3 (dep. 5).

At his deposition, Wheary testified that prior to becoming the Operations Commander, he was employed as a "security officer slash sergeant," as well as a correctional officer.  *Doc. 29-3* at 3 (dep. 6).  Regarding his training as a correctional officer, Wheary testified that NCP correctional officers have (a) annual training and (b) academy training, which consists of a five-week academy at the Department of Corrections. *Doc. 29* at ¶ 21; *doc. 29-3* at 3 (dep. 7).  He testified that, through their training, correctional officers learn the correctional facility policies and protocols. *Doc. 29* at ¶ 29; *doc. 29-3* at 12 (dep. 44).  He further testified that some of their training includes the use of force, force continuum, fire training, use of restraints, code of ethics, and transportation training. *Id.* at ¶ 21.

With respect to the choking allegations made by Olin, Wheary testified that Warden Johnson directed him to review video tapes. *Id.* at ¶ 22.  Wheary testified that he reviewed a number of video cameras in an effort to ascertain whether CO Olvany had entered Olin's cell. *Id.* at ¶ 23.  He testified that CO Olvany had spent time on the block where Olin was housed during the time period that she claimed CO Olvany had choked her. *Id.* at ¶ 24.  He also testified, however, that CO

Olvany only crossed into the threshold of Olin's cell for a period of no more than three seconds. *Id.*

In addition, Wheary testified that NCP has a policy that any time an allegation is made against a correctional officer, it is reviewed. *Id.* at ¶ 25. He testified that if an investigation resulted in any type of a finding, those findings would then be "turn[ed] . . . in," and "we would initiate—if we found that there was anything involved with that, we would initiate a fact finding . . . ." *Id.* at ¶ 26; *doc. 29-3* at 9 (dep. 30). He testified that if warranted by the fact finding process, a pre-disciplinary conference, also referred to as a "PDC," would be conducted and the correctional officer would receive disciplinary action, and the facility would also contact the county detective and the local police department. *Doc. 29* at ¶ 27; *doc. 29-3* at 9 (dep. 31).

### D.   CO Olvany's Testimony.[6]

CO Olvany testified that she has been a correctional officer at NCP for 20 years.   *Doc. 29* at ¶ 46.   She testified that her responsibilities and duties as a correctional officer are the care, custody, and control of the inmates.   *Id.* at ¶ 47. She also testified that she has received the following training as an NCP correctional officer: (1) training at the Department of Corrections in

---

[6] CO Olvany's deposition was conducted on July 23, 2015 and is attached (in condensed form) as an exhibit in support of the defendants' motion for summary judgment. *See doc. 29-6.*

Elizabethtown, approximately 18 years prior to 2015; (2) a five-week training course; and (3) various training throughout the entirety of her career, which consists of training approximately twice a year. *Id.* at ¶ 48. In the context of her training, she also testified as to how she deals with combative inmates. *Id.*

In addition, CO Olvany testified that she has reviewed the written policies about contact with inmates. *Id.* at ¶ 49. Specifically, she stated that "[w]e have orders that we have to initial and we have to sit down during our lunch break or at work and have to read the policies." *Id.* (quoting *doc. 29-6* at 6 (dep. 19)). She also stated that every year she reads the policy book in its entirety and then signs off that she has, in fact, read it. *Doc. 29* at ¶ 50.

### E.  Prison Policies and Procedures of Northumberland County.[7]

As of October 18, 2010,[8] NCP adopted Policy Number 8.01, which relates to the use of force on inmates and provides as follows:

> Human life is sacred. Protecting innocent human life is the most important mission of Northumberland County Prison. Bringing detainees and inmates into immediate compliance is less important than protecting innocent human life, including the protection of an officer's own life.
>
> Detention officers maintain a constant state of readiness and ability to act in instances where, in *their perception*, the *use of*

---

[7] The written policies and procedures regarding certain aspects of NCP's operation standards are attached as an exhibit in support of the defendants' motion for summary judgment. *See doc. 29-4.*

[8] To recap, Olin claims she was choked in August of 2013.

> force or *deadly force* is appropriate. By maintaining readiness
> and ability, officers reduce the likelihood of opposition and of
> the factual need for a forceful response of any kind. While
> officer discretion is critical, the need for accountability and
> control of officer activities is necessary to limit abuses of
> authority. **Officers only use the amount of force reasonably
> necessary to bring inmates into compliance, protect life, and
> protect the integrity of the facility.**

*Doc. 29* at ¶ 37 (emphasis in original); *doc. 29-4* at 51.

## III.    Summary Judgment Standard.

The defendants move for summary judgment pursuant to Rule 56(a) of the

Federal Rules of Civil Procedure, which provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). "Through summary adjudication the court may dispose of those

claims that do not present a 'genuine dispute as to any material fact' and for which

a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v.

U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa.

2011) (quoting FED. R. CIV. P. 56(a)).

The moving party bears the initial responsibility of informing the court of

the basis for its motion and identifying those portions of the record that

demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the

nonmoving party bears the burden of proof, the moving party may discharge that

8

burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can

be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.   Discussion.

Olin's complaint raises the following claims: (1) an Eighth Amendment excessive force claim with municipal and supervisory liability attached thereto; (2) a state law claim of assault and battery; and (3) another state law claim of intentional infliction of emotional distress. *See doc. 1* at 2, 8 (raising "Violation of Eighth Amendment" at Count I; "Assault and Battery" at Count II; and "Intentional Infliction of Emotional Distress" at Count III) (alteration in original).[9] We address each of these claims in turn.

---

[9] It is unclear to the Court whether Olin has also raised a conditions of confinement claim under the Eighth Amendment. *Compare doc. 1* at ¶¶ 25-27 (alleging that Commander Wheary froze her money account and blocked visits by non-inmates, and further alleging that Warden Johnson, along with Commander Wheary, ordered that she be placed in "Max" and that all of her clothing and possessions be confiscated) *with id.* at ¶¶ 44-45 (claiming that the "acts of NCP officers," in freezing her money account, preventing outside visitors, and confiscating her

**A.     Moving Defendants are Entitled to Judgment as a Matter of Law on Plaintiff's Federal Civil Rights Claims.**

**1.     Eighth Amendment Excessive Force Claim.**

As previously mentioned, the core of Olin's complaint concerns allegations that CO Olvany entered her cell while she was sleeping, wrapped a blanket around her neck, and choked her.  Olin, therefore, seeks to hold CO Olvany liable on the theory that CO Olvany used excessive force in violation of the Eighth Amendment. Because, however, CO Olvany has not moved for summary judgment, Olin's excessive force claim against CO Olvany survives this stage of the litigation.

**a.     Municipal Liability.**

Olin also seeks to hold Northumberland County and its Prison Board liable for CO Olvany's use of excessive force on the theory that NCP's policies, training, and supervision, regarding the prevention of "assaults on prisoners," are inadequate.  *See doc. 1* at ¶¶ 46-47.  In moving for summary judgment, the defendants argue that Olin's allegations are thread-bare, conclusory, and fall far short of the requisite specificity to support a claim for municipal liability against the County and its Prison Board.  *See doc. 30*.  We agree.

---

papers and clothes, were acts done in violation of the Eighth Amendment). Moreover, neither party has addressed these allegations in their briefing of the present motion for summary judgment. Thus, the Court will also refrain from addressing these allegations at this time.

While a municipality may not be held liable under § 1983 for the acts of its employees under a theory of *respondeat superior* or vicarious liability, it may be held liable if the plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 694 (1978)). A municipal policy "is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)). And, a municipal custom is a practice that is "so permanent and well settled as to virtually constitute law." *Beck*, 89 F.3d at 971 (quoting *Andrews*, 895 F.2d at 1480) (internal quotation marks omitted). A municipal custom need not be "formally approved by an appropriate decisionmaker," but it must be "so widespread as to have the force of law." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Brown*, 520 U.S. at 404) (internal quotation marks omitted).

In limited circumstances, however, a municipality may also be held liable for constitutional violations that result from inadequate training or supervision of its employees if that failure amounts to deliberate indifference. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) "'[D]eliberate indifference' is

a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.  Although the plaintiff must ordinarily show "[a] pattern of similar constitutional violations" in order to prove deliberate indifference in the failure to train context (*Connick v. Thompson*, 563 U.S. 51, 62 (2011)), the Supreme Court has also suggested that a single incident may sustain deliberate indifference when "the need to train officers . . . can be said to be 'so obvious,'" that the failure to do so would predictably lead to recurrent violations of constitutional rights.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989).  Moreover, "'the identified deficiency in [the municipality's] training program must be closely related to the ultimate injury;' or in other words, the deficiency in training [must have] actually caused the constitutional violation."  *Thomas*, 749 F.3d at 222 (quoting *City of Canton*, 489 U.S. at 391).

Here, to the extent that Olin's claims are based on the alleged inadequacy of a municipal "policy," her claims must fail.  Although Olin broadly alleges that Northumberland County and its Prison Board "have a policy . . . of failing to train and supervise appointed officers in such a way as to prevent assaults on prisoners" (*doc. 1* at ¶ 46), she has not identified that policy, nor has she specified the precise contours of that policy.  She has likewise failed to address which, if any, of the defendants constitute a municipal decisionmaker and whether there is a sufficient

14

link between that decisionmaker and the unidentified "policy." *See McTernan v. City of York, PA*, 564 F.3d 636, 658-59 (3d Cir. 2009) (explaining that a plaintiff, who is seeking to impose liability on a municipality *via* a municipal policy, must identify the relevant policy, specify what exactly the policy entails, and show a link between that challenged policy and a municipal decisionmaker such that the imposition of municipal liability is warranted); *Wood v. Williams*, 568 F. App'x 100, 105 (3d Cir. 2014) (finding no municipal liability on a theory of failure to train or supervise, where there were no allegations showing, among other things, any particular policy or how that policy allowed the claimed constitutional violation to occur, nor were there allegations identifying the policymaker or decisionmaker). Such deficiencies make it impossible for the Court to ensure that Northumberland County and its Prison Board are being "held liable *only* for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Brown*, 520 U.S. at 403-04 (citing *Monell*, 436 U.S. at 694) (emphasis added).

In recognizing these deficiencies, we also observe the written policies of NCP that the defendants have submitted in support of their motion for summary judgment, among which is Policy Number 8.01, "Use of Force & Deadly Force." *See doc. 29* at ¶ 37; *doc. 29-4* at 51. Reviewing this policy, in context with the allegations in the complaint, the parties' respective arguments, and the record as a

whole, we conclude that the only reasonable inference that can be gathered therefrom is that Olin's harm flows not from the inadequacy of a municipal "policy," but from Olvany's alleged failure to comply with such policies.  It is beyond cavil, however, that "an employee's deviation from existing policy cannot, without more, establish the requisite causal link between the alleged constitutional harm and the municipality[.]"  *Nealman v. Laughlin*, No. 1:15-CV-1579, 2016 WL 4539203, at *11 (M.D. Pa. Aug. 31, 2016) (citing *Monell*, 436 U.S. at 691). Rather, it is only when the policy *itself* causes an injury that a municipality may be held liable under § 1983.  *Nealman*, 2016 WL 4539203, at *11 (citing *Monell*, 436 U.S. at 691).  Thus, for all of these reasons, Olin's claim of municipal liability based upon the alleged inadequacy of a municipal "policy" fails.

To the extent that Olin's claims are based on a municipal "custom," her claims must also fail.  Although Olin broadly alleges that Northumberland County and its Prison Board "have a . . . practice and/or procedure of failing to train and supervise appointed officers in such a way as to prevent assaults on prisoners" (*doc. 1* at ¶ 46), neither the complaint, nor the summary judgment record establishes a "pattern" of similar constitutional violations by untrained or unsupervised NCP employees.  *See Connick*, 563 U.S. at 62.  Indeed, there is no reference to any other person whose rights were similarly violated because of the deficient training or supervision of Northumberland County and its Prison Board.

In the absence of such a pattern, Olin has not established that her constitutional injury was, nevertheless, a highly predictable consequence of the County or its Prison Board's failure to train or supervise. *See City of Canton*, 489 U.S. at 390 n.10. Nowhere has Olin identified specific training or supervision not provided to NCP employees, which could reasonably be expected to have prevented the circumstances alleged here—i.e., CO Olvany choking Olin. Thus, Olin has plainly failed to show deliberate indifference on behalf of Northumberland County or its Prison Board.

Moreover, it is undisputed that the policies and procedures of NCP address the use of force on inmates. *See doc. 29* at ¶ 37 ("**Officers only use the amount of force reasonably necessary to bring inmates into compliance, protect life, and protect the integrity of the facility.**") (citing *doc. 29-4* at 51) (emphasis in original). It is further undisputed that CO Olvany was required to review those written policies. *Doc. 29* at ¶ 49 (testifying that "[w]e have orders that we have to initial and we have to sit down during our lunch break or at work and have to read the policies") (quoting *doc. 29-6* at 6 (dep. 19)); *id.* at ¶ 50 (testifying that every year she reads the policies and then signs off that she has, in fact, read those policies) (citing *doc. 29-6* at 6 (dep. 19)). Finally, it is undisputed that CO Olvany received extensive training over her twenty year career as a correctional officer at NCP. *Doc. 29* at ¶ 48 (testifying that she received five weeks of training at the

Department of Corrections in Elizabethtown, as well as various training throughout the entirety of her career, which included training approximately twice a year) (citing *doc. 29-6* at 3 (dep. 8), 4 (dep. 9)).  And, according to Commander Wheary, it is through such training that NCP correctional officers learn the policies and protocols of the prison.  *Doc. 29* at ¶ 29; *doc. 29-3* at 12 (dep. 44)  Thus, Olin's claim for municipal liability based upon the alleged municipal "custom" of failing to train or supervise also fails.

We conclude, therefore, that no reasonable trier of fact could find that a municipal "policy" or "custom" was the "moving force" behind Olin's injury.  *See generally Brown*, 520 U.S. at 404 ("As [the Supreme Court's] § 1983 municipal liability jurisprudence illustrates[,] it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.") (emphasis in original).  Summary judgment, therefore, will be entered for Northumberland County and its Prison Board on Olin's municipal liability claim.

### b.    Individual Liability.

Even though Olin never specifies, she presumably names Warden Johnson and Commander Wheary as defendants on the theory of supervisory liability as it relates to Olin's excessive force claim under the Eighth Amendment. The

18

defendants—who have also remarked that it is unclear whether Olin's complaint raises a supervisory liability claim against Wheary and Johnson—argue that they cannot be held liable on this theory because there is no evidence in the summary judgment record that Commander Wheary or Warden Johnson tolerated any past or on-going misconduct; that they implemented or maintained a policy or practice that created an unreasonable risk of a constitutional violation by Olvany; or that there was a similar pattern of incidents such that their failure to change a policy or employ corrective practices was  a cause of the constitutional injury to Olin.  *See doc. 30*.  We agree.

Liability in a 42 U.S.C. § 1983 action is personal in nature, and to be liable, a defendant must have been personally involved in the wrongful conduct.  In other words, defendants are "liable only for their own unconstitutional conduct."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S.Ct. 2042 (2015).   And so, *respondeat superior* cannot form the basis of liability. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005); *see also Alexander v. Forr*, 297 F. App'x 102, 104-05 (3d Cir. 2008) (instructing that a constitutional deprivation cannot be premised merely on the fact that the defendant was a prison supervisor when the incidents set forth in the complaint occurred).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The United States Court of Appeals for the Third Circuit has "recognized that 'there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell v. Danberg*, No. 14-1667, 2016 WL 4375620, at *9 (3d Cir. Aug. 17, 2016) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

Here, the allegations in the complaint reflect a single incident of alleged misconduct by CO Olvany.  Olin, however, does not contend (much less submit evidence) that Warden Johnson or Commander Wheary established and maintained a policy, custom, or practice which directly caused that misconduct, nor does she contend that they participated in or directed that misconduct to occur.  Olin likewise does not contend that, as persons in charge, they had knowledge of and acquiesced in CO Olvany's misconduct.  To the contrary, the summary judgment record is wanting of any evidence that Johnson or Wheary had actual or constructive knowledge of any wrongdoing by Olvany at the time of the alleged

choking.  In fact, Olin testified at her deposition that she did not inform the Warden of CO Olvany's misconduct until "[t]hree, maybe four days" later (*see doc. 29-2* at 6 (dep. 18)), at which time the Warden directed Commander Wheary to review the video tapes pertaining to the time frame in which the alleged choking was said to have occurred (*see doc. 29* at ¶ 22). Therefore, Olin has not demonstrated the requisite personal involvement for a supervisory liability claim as to the excessive force that is alleged to have been used by CO Olvany. Accordingly, summary judgment will also be entered for Commander Wheary and Warden Johnson as to Olin's supervisory liability claims.

### B.     Moving Defendants are Also Entitled to Judgment as a Matter of Law on Plaintiff's State Law Claims.

In addition to her federal civil rights claims, Olin also asserts state law claims of assault and battery (Count II) and intentional infliction of emotional distress (Count III). *Doc. 1* at 8.  The moving defendants have raised an immunity defense to these claims pursuant to the Political Subdivision Tort Claims Act, 42 PA. CONS. STAT. § 8541.  It is evident to us, however, that Olin's allegations in support of her state law claims are *only* levied against CO Olvany.  *See, e.g.*, *doc. 1* at 8 (averring that Olvany caused bodily injury to her; Olvany placed her in reasonable fear; Olvany committed an assault and battery upon her); (further averring that Olvany inflicted severe emotional distress upon her and that as a direct and proximate result of the distress inflicted by Olvany, she requires ongoing

mental health treatment). Because CO Olvany has not moved for summary judgment, we will not address the state law claims that have been brought against her.  As a result, Olin's assault and battery (Count II) and intentional infliction of emotional distress (Count III) claims against CO Olvany also survive this stage of the litigation.

## V.    Conclusion.

Based upon the foregoing, the Court will grant the moving defendants' motion (*doc. 28*) for summary judgment in its entirety.  An implementing order follows.

<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge